**Slip Op. 26-13**

**UNITED STATES**
**COURT OF INTERNATIONAL TRADE**

**Consol. Court No. 21-00616**

ASSAN ALUMINYUM SANAYI VE TICARET A.S.,

*Plaintiff/Defendant-Intervenor,*

v.

UNITED STATES,

*Defendant,*

and

ALUMINUM ASSOCIATION TRADE
ENFORCEMENT WORKING GROUP
and its individual members,

*Consolidated Plaintiffs/Defendant-Intervenors.*

Before: M. Miller Baker, Judge

**OPINION**

[Sustaining Commerce in Case 21-616 and remanding in Case 21-618.]

Dated: February 18, 2026

*Leah N. Scarpelli*, *Matthew M. Nolan*, and *Jessica R. DiPietro*, ArentFox Schiff LLP, Washington, DC, on the comments for Plaintiff/Defendant-Intervenor.

*John M. Herrmann*, *Paul C. Rosenthal*, and *Joshua R. Morey*, Kelley Drye & Warren LLP, Washington, DC,

on the comments for Consolidated Plaintiffs/Defend-
ant-Intervenors.

*Emma E. Bond*, Senior Trial Counsel, Commercial Lit-
igation Branch, Civil Division, U.S. Department of
Justice, Washington, DC, on the comments for Defend-
ant. Of counsel for Defendant was *JonZachary Forbes*,
Senior Attorney, Office of the Chief Counsel for Trade
Enforcement and Compliance, U.S. Department of
Commerce, Washington, DC.

*Baker*, Judge: These consolidated challenges to the
results of the Department of Commerce's antidumping
investigation of aluminum foil from Turkey return fol-
lowing remand. *See Assan Aluminyum Sanayi ve Ti-
caret A.S. v. United States*, Slip Op. 24-56, 2024 WL
2044061 (CIT 2024) (Remand Op.). For the reasons
stated below, the court sustains the redetermination
in Case 21-616 and remands Case 21-618 for further
proceedings.

I

In this litigation's first round, Turkish foil manu-
facturer Assan Aluminyum Sanayi ve Ticaret A.S. as-
serted that four deficiencies in Commerce's determina-
tion inflated its dumping margin: (1) the denominator
used in the calculation of a drawback adjustment;
(2) the treatment of late fees in that same calculation;
(3) the handling of certain management fees as indi-
rect selling expenses; and (4) the averaging of raw ma-
terial costs. *Id.* at 2, 2024 WL 2044061, at *1. Attack-
ing from the other direction, the Aluminum Associa-

tion Trade Enforcement Working Group and its con-
stituent domestic producer members (collectively, the
Association)[1] contended that Assan received a deflated
dumping margin because the Department treated its
hedging revenues as part of its cost of production. *Id.*
The government, meanwhile, asked for a voluntary re-
mand to allow the agency to reconsider the drawback
denominator question. *Id.*

The court granted the government's request. *Id.* at
2, 2024 WL 2044061, at *1. It also sustained the
agency's decision as to late fees and management fees.
*Id.* at 22; 2024 WL 2044061, at *8.

As for raw material costs, the court remanded be-
cause the Department failed to address one of Assan's
arguments. *Id.* at 27–28, 2024 WL 2044061, at *10.
Commerce acknowledged the company's theory that
any analysis should look at the total cost of manufac-
turing, not just the cost of the material itself, but gave
no explanation for rejecting it. The court directed the
agency to reconsider or further explain its decision. *Id.*
at 28–30, 2024 WL 2044061, at *10.

Regarding hedging revenues, the court observed
that the Department's decision rested "on the rejection
of a series of claims [by the Association] that Com-
merce and Assan now concede are at least partially

---

[1] The Association intervened in Assan's case (Case 21-616)
to support the government and also brought its own chal-
lenge (Case 21-618). The court fully consolidated the two
matters under the former docket.

correct." *Id.* at 37, 2024 WL 2044061, at *13. The court directed the agency "to reconsider or further explain its treatment of Assan's hedging revenues and to support that explanation with substantial evidence." *Id.* at 37–38, 2024 WL 2044061, at *14.

On remand, the agency modified its duty drawback methodology and adjusted its calculation. For the raw material cost and hedging revenue issues, it provided more explanation but made no changes. The upshot was that Assan's weighted-average dumping margin, and the "all-others" rate derived from it, increased by 0.02 percent. Appx126–127. For different reasons, neither the company nor the Association is happy with that result.

## II

### A

#### 1

Turkey's duty drawback program[2] is called the "Inward Processing Regime." Remand Op. at 6, 2024 WL 2044061, at *2. A participating company imports raw materials without paying duties and receives an

---

[2] A drawback occurs when "a producer normally pays input duties on a manufacturing input but receives some type of duty rebate or exemption for exporting goods containing that input to the United States." Remand Op. at 6, 2024 WL 2044061, at *2. In such cases, "Commerce must adjust the constructed export price to factor in the forgiven duties." *Id.* (citing 19 U.S.C. § 1677a(c)(1)(B)).

"inward processing certificate."[3] *Id.* It must then export a set quantity of goods within a set time to "close" the certificate and avoid duty liability, though it can also receive the benefit later if it meets the quantity requirement and pays a late fee. *Id.*

In its original decision, Commerce "calculated the per-unit duty drawback adjustment using as the numerator exempted import duties associated with subject exports and using as the denominator the total quantity of all U.S. database sales." Appx132. It "then applied the per-unit amount to all U.S. database sales, effectuating an adjustment to each sale regardless of whether it was associated with the closed" certificate. *Id.*

On remand, the agency changed course. It explained that "because the purpose and scope of the adjustment to [the] U.S. price described in [19 U.S.C. § 1677a(c)(1)(B)[4]] pertain to subject merchandise, the

---

[3] Using case-specific jargon when plain English would do just fine, the parties for no good reason insist on calling the certificates "IPCs." *Cf. Giorgio Foods, Inc. v. United States*, Slip Op. 24-79, at 6 n.5, 2024 WL 3534491, at *2 n.5 (CIT 2024) (admonishing the parties for "adopting agency bureaucratese" and unnecessarily using obscure acronyms "not generally known by the trade bar, much less educated lay readers"), *appeal pending*, No. 25-2090 (Fed. Cir.).

[4] This provision states that "[t]he price used to establish [the] export price and constructed export price shall be . . . increased by. . . the amount of any import duties imposed by the country of exportation which have been rebated, or

(footnote continues on next page)

basis of the duty drawback benefit should also be limited to import duties associated only with subject merchandise." Appx132. Therefore, it was "more appropriate to use as the denominator the quantity of U.S. database sales associated with the closed [certificate] and apply that per-unit amount only to U.S. database sales associated with the [same] closed [certificate]." Appx132–133. This approach limited the drawback adjustment "only to the U.S. sales that were entitled to the benefit." Appx133. It also "maintained the correspondence of values between the denominator and the universe of U.S. sales to which the resultant per-unit adjustment is applied." *Id.* Finally, this methodology was blessed by the court in *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 701 F. Supp. 3d 1321 (CIT 2024) (*Assan 2024*). *Id.*[5]

2

Assan observes that the Department's "calculation limits the drawback afforded to [the company] to only

which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B).

[5] Despite this case and *Assan 2024* having identical names and some overlap in issues, they concern different goods. The latter action involved an antidumping investigation of common alloy aluminum sheet from Turkey (*Aluminum Sheet*), *see* Appx198 (second remand results in that proceeding), whereas this matter entails an antidumping investigation of aluminum foil from that country, *see* Appx126 (remand results here).

one" certificate,[6] even though it imported the products in question under multiple certificates during the period of investigation and all its U.S. sales were covered by such documents. ECF 114, at 11. The agency's rationale was that only one certificate closed during the period of investigation. *Id.* It declined to assume that certificates open in that time frame would ultimately close. *Id.*

Assan contends that Commerce's failure to so assume that open certificates would ultimately close violates "19 U.S.C. § 1677a(c)(1)(B), which requires an adjustment based on the 'entire drawback.'" *Id.* (quoting *Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1198 (Fed. Cir. 2021)). But on this record—which shows that only a single certificate closed during the period of investigation or otherwise, *see* ECF 113, at 11 (the company so acknowledging)—the

---

[6] Assan denominated the word "one" in this phrase as confidential and redacted it from its public comments. But the court finds that the company waived this protection earlier in that same submission. *See* ECF 114, at 2–3 (stating that Commerce "limited its application of that adjustment to only U.S. sales associated with a *single* [certificate], rather than all U.S. sales during the period of investigation") (emphasis added); *see also* 19 U.S.C. § 1516a(b)(2)(B) (providing that the court "shall . . . preserve[] in any action under this section" the "confidential or privileged status accorded to any documents, comments, or information," except that it "may disclose such material under such terms and conditions as it may order"); *cf.* Fed. Cir. R. 25.1(c)(1) ("Material will lose its status as subject to a protective order, however, if and when it . . . has appeared in a filing without being marked confidential.").

Department's adjustment *was* based on the "entire drawback." That's because an open certificate "yields no duty exemptions" during that time frame, and "indeed may never close at all." *Assan 2024*, 701 F. Supp. 3d at 1329. The statute directs the agency "to predicate drawback adjustments on the exemption of duties—not a likelihood of future exemption through the contingent operation of a foreign government's duty exemption scheme." *Id*.[7]

Assan alternatively contends that the Department abused its discretion by denying the company's request to reopen the record to allow evidence that some certificates closed after the period of investigation. ECF 114, at 12–17; *see also* ECF 124, at 5 (Assan reply acknowledging that the agency "has discretion in this area"). It points to what it characterizes as "Commerce's disparate treatment of Assan's" certificates in this case and on remand in *Aluminum Sheet*. ECF 114, at 12.

In the latter, the agency "re-opened the record to request additional information necessary for purposes of calculating Assan's duty drawback adjustment."

---

[7] Assan's argument also attempts to circumvent the Remand Opinion. As noted above, the court sustained the Department's practice of offsetting any drawback adjustment by the amount of any late fees Assan paid as a prerequisite to closing the certificate. *See* Remand Op. at 24–27, 2024 WL 2044061, at *9. If a company owes a late fee and fails to pay, it gets no drawback for exports under that certificate. Assuming that all certificates will close would effectively eliminate the late-fee offset.

Appx198. As a result of that reopening, the Department opted to use certificates that closed outside the period of investigation for calculating a drawback adjustment "when sufficient evidence exists on the [reopened] record to demonstrate their closure." Appx201. But here, according to the company, "Commerce did not allow Assan the same opportunity to submit closure documentation." ECF 114, at 13.

The agency gave three reasons for not doing so. First, the court did not order it. Appx147. Second, unlike in *Aluminum Sheet*, nothing was missing that required reopening. *Id.*; Appx150 & n.91. Finally, in its CIT complaint, "Assan did not preserve any arguments with respect to the data Commerce employed." Appx147–148.

The government harps on this last preservation point, noting that the company's challenge to the agency's refusal to reopen the record fails to acknowledge, much less contest, it. *See* ECF 118, at 15–16. On reply, Assan again sidesteps the preservation issue in its discussion of the drawback adjustment. *See* ECF 124, at 4–7.

An interested party challenging agency action does not have the luxury of ignoring stated reasons for the disputed decision. Commerce's redetermination "is presumed to be correct," 28 U.S.C. § 2639(a)(1), and Assan has the "burden of proving otherwise," *id*. The company having failed to contest the Department's preservation rationale for not reopening the record, the court sustains that decision. *Cf. KYD, Inc. v.*

*United States*, 836 F. Supp. 2d 1410, 1414 (CIT 2012)
("[A]ll claims, arguments, and objections that [a plain-
tiff has] elected not to address in its post-remand
briefs must be deemed waived.") (brackets in original)
(quoting *Bond St., Ltd. v. United States*, 774 F. Supp.
2d 1251, 1261 (CIT 2011)). It is therefore unnecessary
for the court to consider the company's challenge to the
Department's other reasons for not reopening the rec-
ord.[8]

B

1

Assan's aluminum raw material costs contain two
components, the market price for that commodity on
the London Metal Exchange and a "raw material pre-
mium." Remand Op. at 13, 2024 WL 2044061, at *5.
The latter is an adjustment to the former price that
reflects the form of the aluminum input—either scrap,
sheet, or primary aluminum. *Id.* The adjustment
might be *negative*, as in the case of scrap, but that "is

---

[8] Assan also complains in passing that Commerce struck
portions of its drawback adjustment comments on the
agency's draft remand results. ECF 114, at 14 n.1. The
company makes no effort to develop the argument beyond
stating that it "disagrees with and objects to" the striking.
*Id.* It has therefore waived this point as well. "Litigants
must provide meat on the bones of their arguments if they
expect the court to seriously entertain them." *Home Ortho-
pedics Corp. v. Rodriguez*, 781 F.3d 521, 528 (1st Cir. 2015)
(cleaned up); *Green Farms Seafood Joint Stock Co. v.
United States*, Slip Op. 25-89, at 5, 2025 WL 1905115, at *3
(CIT 2025) (citing *Rodriguez* for that point).

offset by higher labor and overhead costs necessitated by the additional manufacturing when more scrap is used." ECF 114, at 20. Conversely, a positive premium for sheet aluminum raises the input cost *above* the London exchange price but reduces ensuing manufacturing costs because less effort is necessary to make foil. *Id*. "Thus"—as the agency explained on remand—the "aluminum premium cost *is closely linked* to the [London exchange] portion of the raw material cost." Appx138 (emphasis added).

In its original decision, Commerce departed from Assan's reported costs for the London market price and instead used a weighted average "to eliminate distortions caused by changing aluminum prices throughout the period of investigation." Remand Op. at 14, 2024 WL 2044061, at *5. The company agreed with this approach. *Id*. For the premium adjustment, the Department similarly used a weighted average, but Assan objected. *Id*. The court returned the matter to the agency because the latter failed to address the company's argument that it instead "should look at the total cost of manufacturing, not just the raw material costs." *Id*. at 28, 2024 WL 2044061, at *10.

On remand, Commerce stated that it "required Assan to report the physical characteristics of its products (i.e., gauge, coating, width, casting method, alloy, temper, and surface finish)." Appx134. "[T]hese physical characteristics differentiate the production costs between distinct, unique product control numbers." *Id*. Under the statute, "a respondent's reported costs should reflect meaningful cost differences attributable

to these different physical characteristics." *Id*. "This approach ensures" that the control number–specific costs the agency "uses for the test of sales made below cost . . . accurately reflect the physical characteristics of the products used in Commerce's margin calculations." *Id*. The agency thus "normally does not rely on a respondent's reported costs where cost differentials between [control numbers] *are driven by factors other than the difference in the physical characteristics*." *Id*. (emphasis added).

With that background, the Department addressed Assan's contention that it should base its analysis of the premium cost differential between control numbers on total costs of manufacturing rather than material costs. Appx137. Following this approach would not allow Commerce to "isolate the cost differences associated with the relevant product physical characteristic from the cost differences associated with" other factors. *Id*.

To determine what drove Assan's premium cost differentials, Commerce instead compared the specific cost for each control number—"i.e., the sum of" the control number–specific London exchange cost and the premium cost, Appx153—to the period-of-investigation weighted average raw material cost, *id*. It "reflected the significant cost differences" between control numbers "that are unrelated to the product's physical characteristics." *Id*. Thus, the Department "continue[d] to disagree with Assan that its books and records 'reasonably reflect the cost to produce the

merchandise under consideration based on the physical characteristics' identified by" the agency. *Id*.

Commerce also disagreed with Assan that it "only considered the physical differences for the finished products and did not adequately address the differences in raw materials used to produce" them. Appx154. The Department observed that it asked the company about the raw material inputs used, including whether they were interchangeable and what factors the company relied on to decide which to use for a finished product. Assan replied that while all raw material types can be used interchangeably to produce the aluminum foil at issue, it decides which one to use based on its "preferred production routing due to certain characteristics of its production equipment." *Id*. Commerce weighed this evidence as meaning that except for production yield losses, differences in the raw material cost between control numbers were based on factors other than the *product's* physical characteristics. *Id*.

As for those yield losses, the Department asked the company to identify and separately report the costs associated with them for each control number using the figures in its database, but Assan did not do so. Appx154–155. The agency found that the company could have complied, though doing so "would require some effort." Appx155. "Assan, however, made no attempt to provide Commerce with" the requested breakdown, "and thus, this information to calculate product-specific yield losses is not available on the record." *Id*. Therefore, the Department continued "to weight

average the reported [raw material premium] cost for all [control numbers] to mitigate the cost differences unrelated to the physical characteristics." Appx155.

## 2

Assan challenges Commerce's treatment of the raw material premiums. It first argues that the Department did not adequately address its argument that there is an inverse relationship between its raw material premium costs and its production costs. ECF 114, at 17–18. It characterizes the agency's dismissal of the subject—that "fabrication costs are not associated with the reported raw material costs," Appx137—as "conclusory." ECF 114, at 18.

But the Department was not conclusory (a mortal administrative law sin)—it was just clumsy (a venial sin). The sentence in question concluded a paragraph in which the agency explained that it seeks to "isolate the cost differences associated with the relevant product physical characteristic from the cost differences associated with" other factors. Appx137. Assan's request that the agency base its analysis on total manufacturing costs would not allow it to do so. *Id.* Read in context with the remainder of the paragraph and other parts of the redetermination, *cf. Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (the court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"), it's apparent that Commerce determined that Assan's reported premium costs "reflected . . . cost

differences unrelated to the *product's* physical characteristics." Appx139 (emphasis added).[9]

The company then pivots to attack that finding, the heart of its dispute with the agency. *See* ECF 114, at 18–20. It zeroes in on the Department's basing its calculation on "the *sum*" of premium costs and the London exchange costs for aluminum inputs. *Id.* at 18 (emphasis in original). It argues that "[t]rends in the *sum*" of these two addends are driven by the latter. *Id.* at 19 (emphasis in original). Consequently, this total "cannot be used to support Commerce's conclusion that 'the reported raw material costs . . . reflected the significant cost differences between [control numbers] that are unrelated to the product's physical characteristics.'" *Id.* (ellipsis in original).

According to Assan, the agency's rationale for its approach—that premium costs and the London exchange costs are "closely linked," Appx138, is flawed. That's because the latter are "subject to significant fluctuations from month to month" and are "not impac-

---

[9] As the government points out, Assan's contention that the agency did not sufficiently address its argument that the differences in its input types drove its production costs also "confuses the physical characteristics of the input products with the physical characteristics of the final finished products." ECF 118, at 24. The Department reasonably found that because the company's inputs were interchangeable, the differences in the raw material costs between control numbers were based on factors other than the *product's* physical characteristics. Appx154.

ted by yield loss." ECF 114, at 20. The former, however, are not so impacted. *Id*.

But Assan does not dispute Commerce's premise—that the two costs *are* closely linked. That finding is reasonable, as the premium cost is simply an *adjustment* to the fluctuating London exchange price, the baseline. Remand Op. at 13, 2024 WL 2044061, at *5. Given this linkage, substantial evidence supports the Department's conclusion that "the significant cost differences" between control numbers "are unrelated to the product's physical characteristics." Appx153.[10]

Assan also takes issue with Commerce's finding that the company did not, as requested, identify and separately report its costs for each control number using the figures in its database. Appx154–155; ECF 114, at 21–23. It accuses the Department of "speculat[ing]" that it could have reported its figures in the requested way. ECF 114, at 21. It contends that it "is unable to include the separate fields" because its accounting software does not allow for it. *Id*. It then argues that the data it provided were sufficient. *Id*. at 22.

In its original determination, the agency explained that it asked the company to "identify and separately report the costs associated with yield losses for each" control number by breaking out the associated raw

---

[10] Commerce supported this conclusion with a detailed analysis that Assan does not challenge. *See* Appx89022–89023, Appx89027–89033. This reasoning is thus "presumed to be correct." 28 U.S.C. § 2639(a)(1).

material premium costs. Appx007651. It rejected the company's claim about its software: "A large, sophisticated company like Assan can reasonably determine [control number–]specific yield losses and the related costs embedded in the [raw material premium] field regardless [of] any limitations [in] its accounting system. . . . Assan, however, made no attempt to provide Commerce with" the requested breakdown. *Id.* The agency therefore found that necessary information was missing from the record and, invoking 19 U.S.C. § 1677e(a)(1), stated that it would resort to facts otherwise available to fill the gap in the record, which it elected to do by weight-averaging the reported raw material premium costs for all control numbers. *Id.*

The remand determination was less specific in that it neither referred to facts otherwise available nor invoked § 1677e. In substance, however, it echoed the original determination. As before, it observed that respondents often face accounting system limitations but still report information in the manner requested. *Compare* Appx155 (redetermination) *with* Appx007651 (original determination). Also as before, it stated that Assan could have provided the requested information with "some effort" but opted not to do so, and it affirmed that the "requested information was necessary" but was "not available on the record." *Compare* Appx155 *with* Appx007651. "For these reasons, [Commerce] continue[d] on remand to weight average the reported [raw material premium] cost for all [control numbers] to mitigate the cost differences unrelated to the product physical characteristics." Appx155; *cf.* Appx007651 (referring to that action as a

form of facts otherwise available). It's thus readily apparent that the agency again applied facts otherwise available. *Cf. Bowman*, 419 U.S. at 286 (the court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

A respondent must report data in the form and manner Commerce requests unless the party asks for, and receives, advance permission to do otherwise. *See* 19 U.S.C. § 1677m(c)(1) (requiring that such a request be supported by a statement of reasons why the party cannot comply with the requirements and a suggestion of an alternative mechanism). Assan cites nothing in the administrative record to establish that it made such a request in advance here—instead, it simply cites questionnaire responses in which it said it was impossible to comply. *See* Appx006766. The court thus can neither consider its argument about what information it had available nor second-guess the Department's conclusion that the company could have provided the requested data. *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1361 & n.41 (CIT 2020) (recognizing that the decision "to deem [an] alternative format acceptable. . . . is not the Court's to make"). The court therefore sustains Commerce's handling of the raw material premiums as a reasonable application of facts otherwise available.

\*    \*    \*

The court sustains the agency's redetermination in Case 21-616. Notwithstanding the consolidation of that action with Case 21-618, which is not yet final for

reasons explained below, the court will immediately enter judgment in the former. That's because "[i]t is of great importance in litigation to know precisely . . . when [judgment] was entered." 11 Wright & Miller, *Federal Practice and Procedure* § 2781 (3d ed. Sept. 2025 update).[11]

---

[11] Federal Rule of Civil Procedure 42(a)—and by extension, USCIT Rule 42(a), under which these actions were consolidated—"did not purport to alter the settled understanding of the consequences of consolidation. That understanding makes clear that when one of several consolidated cases is finally decided, a disappointed litigant is free to seek review of that decision in the court of appeals." *Hall v. Hall*, 584 U.S. 59, 78 (2018). For that reason, "separate verdicts and judgments are normally necessary." *Id.* at 76 (quoting 3 J. Moore & J. Friedman, *Moore's Federal Practice* § 42.01, at 3051 n.12 (1938)). Consolidation thus does not obviate the necessity for the "prompt entry of judgment" contemplated by Rule 58. Wright & Miller § 2781.

Were the court to fail to enter judgment in Case 21-616 now, it would enter silently in the background by operation of law in 150 days, even if Case 21-618 remained nonfinal. *See* USCIT R. 58(c)(2)(B). The 60-day period to appeal would then start to run—again silently, in the background. Thus, a disappointed litigant in one of several consolidated cases that waits until the court enters a single judgment finally disposing of all such actions risks forfeiting its appeal rights. The prompt entry of separate judgments as constituent cases become final in consolidated litigation unequivocally signals that the time to appeal has started to run and avoids creating an appellate jurisdictional trap for the unwary.

III

A

In the remand results, the Department explained that Assan routinely makes hedging transactions to eliminate the risk of fluctuations in the cost of the aluminum it buys to produce its foil. The company records the hedging gains and losses in its books and records as part of the cost of sales. When it reported its costs of production during the antidumping investigation, it reduced its reported total cost of manufacturing by the net hedging gains. Commerce's original decision accepted that reporting but adjusted the net gains "to account for the timing difference related to the purchases of aluminum input and the settlement of the associated commodity hedging contract." Appx139–140.

The Association objected that because Assan makes the hedging transactions after it buys the raw materials, the gains relate to the finished products' sales prices and not to the raw materials' purchase prices. Therefore, it said, the agency should not have allowed the net hedging gains to offset the cost of manufacturing because they were unrelated to the cost of production. Appx140. The court remanded for further explanation after counsel's statements at oral argument suggested the hedging may be related to sales as the Association contended. *Id.*

On remand, Commerce didn't budge. It noted, as it did with the raw material premium, that the statute requires the agency to use the company's normal books

and records if they comply with Turkish accounting practices and they reasonably reflect the costs associated with production and sale. The Department again determined that Assan's records satisfied the first criterion, so the question was whether including the net hedging gains in the cost of production reasonably reflected what it cost to make the aluminum foil at issue. Appx142–143.

The agency found that when the company purchases the aluminum raw material, it enters into a hedging contract to sell a similar quantity of metal in the future, and when it does the latter, it closes the hedging contracts by "reversing its position in the commodities market." Appx143. Commerce concluded that the sum of the gain or loss on the commodities hedging contracts and the raw material purchases that trigger them represent Assan's total net raw material costs incurred to produce the aluminum foil at issue. *Id.* It observed that the records the company provided showed that the monthly hedge quantities were very close to its monthly raw material quantities, which it found indicative of a linkage between the two. Appx143–144. "When viewed from this perspective," it seemed "that Assan's hedging activities are to mitigate the risk of fluctuation of raw material costs which will be consumed in the production of merchandise under consideration, and that they are properly considered as part of the" cost of manufacturing. Appx144. The Department found it insignificant that the hedging transactions take place after the raw material purchases. *Id.*

A further issue involved Assan's use of "mark-to-market accounting," which Commerce described as an accounting method used to ensure that the assets and liabilities listed on a company's balance sheet at a particular time reflect fair market value at that same time. *Id.* Assan assessed the current value of both its physical inventory on hand and its open hedging contracts at the end of the period of investigation using mark-to-market accounting to ensure consistency with International Financial Reporting Standards requirements. *Id.* The company maintained two specific accounts to record adjustments required by those standards, and the Department found that the adjustments reflected the value of the London exchange portion of the physical inventory and the value of open exchange hedge contracts at the time when the financial statements were prepared. Appx141.

Commerce concluded that Assan calculates the value of the exchange portion of its inventory when it prepares its financial statements—if the market value is higher than the cost, it records a gain; if the value is lower, it records a loss. "Thus, the gains and losses recorded in those two accounts . . . are purely related to the inventory valuation gains and losses under the [International Standards] and they are not generated from actual hedging transactions." Appx142. The Department also found that the adjustments resulting from mark-to-market accounting were different from the net hedging gains associated with closed hedging contracts on inventory consumed during the period of investigation—instead, they reflected the value of inventory remaining on the balance sheets at the end of

that period. Appx144–145. It therefore determined that the gains on the mark-to-market inventory represent a valuation adjustment for Assan's inventory to reflect fair market value, and it stood by its original conclusion that including the gains in the cost-of-production calculation was reasonable. Appx145. Finally, it also noted that this result was consistent with its analysis in the *Aluminum Sheet* proceeding involving Assan. *Id.*

## B

The Association now challenges Commerce's decision on the hedging issue. It observes that the court found that the agency's original determination "rest[ed] on the rejection of claims that [the agency and the company] now concede are at least partially correct," Remand Op. at 37, 2024 WL 2044061, at *13—specifically, that Assan's hedging transactions are, in some way, related to its sales of finished goods. ECF 117, at 2. It cites its comments on the draft remand results, *id.*, which contended that the Department failed to address those concessions, Appx108. Those comments also argued that the agency did not explain "why Assan would attempt to manage the aluminum price risk associated with its raw material purchases, but completely ignore the aluminum price risk associated with its sale of finished goods or its inventory." Appx109. They asserted that the "only reasonable inference" is that the company's hedging is a means of managing its overall price risk from both raw material purchases and sales of finished goods, such

that the transactions "are financial in nature and the associated gains belong in interest expenses." *Id.*

The Association maintains that Commerce "dismissed" its arguments on the ground that Assan recorded its net hedging gains as part of the cost of goods sold on its audited income statement, which the agency said it had a statutory obligation to accept. ECF 117, at 4 (citing Appx159 and 19 U.S.C. § 1677b(f)(1)(A)). The group contends that the income statement is only one part of the company's books and records, along with the audited cash flow statement, and the agency did not explain why it deemed the former more authoritative than the latter. *Id.* at 4–5. The sealed version of the comments the Association submitted to the agency essentially argued that Assan classified the hedging transactions differently in its cash flow statement than it did in its income statement. *See* Appx93279–93280.

Neither the government nor the company meaningfully responds to that point. To be sure, Assan contends that it is irrelevant. The company asserts that (1) its "net hedging gains and losses are recorded as a part of cost of goods sold in [its] audited financial statements," ECF 124, at 16–17, (2) the company's auditor approved that reporting, *id.* at 17, and (3) "Commerce *must* 'calculate costs based on a respondent's normal books and records if they are kept in accordance with home country GAAP and reasonably reflect the costs associated with the production and sale of the merchandise,'" *id.* at 17–18 (emphasis in original) (quoting Appx142). Therefore, Assan contends, the agency was

obligated to do so here because the income statement satisfied those criteria. *Id.* But that does not respond to the Association's argument that *both* the audited income statement on which the Department relied *and* the audited cash flow statement it did not consider are part of the company's "normal books and records." Neither the company nor the government addresses what happens when such books and records are internally inconsistent.[12]

Rather than coming to grips with that point, they both echo the statement the Department made in the remand results that "the possibility of drawing two inconsistent conclusions from the record evidence does not prevent Commerce's finding from being supported by substantial evidence." Appx141; *see also* ECF 118, at 27–28 (government, claiming the court must sustain as long as substantial evidence supports the agency's position); ECF 124, at 16–18 (the company,

---

[12] Similarly, in "disagree[ing] with the Aluminum Association that the net hedging gains should be included in the interest expense calculation because of how the hedging transactions are presented in Assan's cash flow statement," Commerce again emphasized the words "audited income statement." It said the statute requires it to rely on the company's normal books and records if they satisfy the two statutory criteria. Appx159–160. That explanation fails to address whether the audited cash flow statement is also part of the books and records and whether it meets the statute's requirements.

making the argument summarized above).[13] But, in remanding, the court observed that while that statement is accurate as a general matter, "this feature of the substantial evidence standard still requires [the agency's] *explanation* be supported by substantial evidence." Remand Op. at 37, 2024 WL 2044061, at *13 (emphasis in original).

If, as here, a party contends that another part of the record contradicts the portion on which Commerce chooses to rely, it is not enough for the Department simply to say that its chosen document supports its conclusion. It must also give a meaningful explanation for why it finds the other part of the record unconvincing or less persuasive because "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). By failing to respond to the Association's claim that other record evidence contradicts the document on which it elected to rely, Commerce has "failed to consider an important aspect of the problem."[14] *Motor*

---

[13] The company essentially reargues the same theory it advocated prior to remand. *See* Remand Op. at 36, 2024 WL 2044061, at *13 ("Assan's argument rests on the fact that the substantial evidence standard allows Commerce to choose between multiple options when the record supports either.").

[14] The Department did *mention* the point in passing but then waved it away by emphasizing that it was relying on Assan's "*audited income statement*" and citing the statutory command to accept such records if they satisfy the

(footnote continues on next page)

*Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The agency did say, without elaboration, that its "preference" is to use "a respondent's audited *income statement*." Appx157 (emphasis in original). Because the statute requires the Department to "consider *all available evidence* on the proper allocation of costs," 19 U.S.C. § 1677b(f)(1)(A) (emphasis added), a regulatory "preference" is not a substantive rule of decision. Rather, it is at best a tiebreaker when potential sources the agency must consider are otherwise equal. *Cf. Catfish Farmers of Am. v. United States*, Slip Op. 24-67, at 14, 2024 WL 2843039, at *5 (CIT 2024) (making this point in the context of a statutory requirement to use "the best available information"). An agency's "preference" does not answer the question of whether another financial document in the record might be more accurate than the one Commerce "prefers," assuming the other document also satisfies the statutory criteria for relying on "books and records." And failing even to address whether potentially contradictory record evidence cited by a party satisfies those factors violates the statutory command to consider "all avail-

———————————

statutory criteria. Appx159–160 (emphasis in original). Regardless of the agency's use of emphasis, its assertion does not respond to the Association's argument that the "audited cash flow statement" treated the same sorts of transactions differently. *See* ECF 117, at 4 ("The Department has not explained why Assan's audited income statement is more authoritative than [its] audited cash flow statement.").

able evidence." 19 U.S.C. § 1677b(f)(1)(A). The court must therefore remand Case 21-618 for the agency to further explain its reasoning in view of the statute's requirements.

Dated: February 18, 2026        _/s/ M. Miller Baker_
         New York, NY             Judge